# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 2776 | **DATE** | 3/26/2004 |
| **CASE TITLE** | Mickki Fatima Muhammad vs. Michael F. Sheehan, et al. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 5/17/04 at 9:00 a.m.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendants' motion for summary judgment [Doc. No. 42-1] is granted in part and denied in part. Counts I, II, and IV are dismissed with prejudice. Counts V, VI, and VIII are dismissed voluntarily. Counts III and VII to proceed, but Defendants Prybell, Judge, and Malinowski are dismissed from this action. This matter is referred to Magistrate Judge Keys for a settlement conference.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 3 | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | MAR 29 2004 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | 59 |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 3/26/2004 | |
| ETV | courtroom deputy's initials | U.S. DISTRICT COURT | date mailed notice | |
| | | | ETV | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

UNITED STATES DISTRICT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MICKKI FATIMA MUHAMMAD,      )
     )
         **Plaintiff,**     )
     )
         v.     )    **No. 02 C 2776**
     )
MICHAEL F. SHEAHAN, in his official     )    **Judge Rebecca R. Pallmeyer**
capacity as Sheriff of Cook County, Illinois;     )
the COUNTY OF COOK, a unit of local     )
Government; LT. WILLIAM JUDGE, in     )
his individual and Official capacities;     )
SGT. WILLIAM PRYBELL, in his     )
individual and official capacities; FIRST     )
DEPUTY CHIEF JAMES MALINOWSKI,     )
in his individual and official capacities,     )
     )
         **Defendants.**     )

DOCKETED

MAR 2 9 2004

## MEMORANDUM OPINION AND ORDER

Plaintiff, a former officer with the Cook County Sheriff's Police Department, has filed this

action against the County Sheriff and three superior officers. She alleges that she was subjected

to harassment and unfair discipline on the bases of her race, sex, and disability status, and in

retaliation for her previous complaints. Plaintiff's Amended Complaint charges Defendants with

race discrimination in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e (Count I) and

under 42 U.S.C. § 1981 (Count II); violation of the Americans with Disabilities Act ("ADA"), 42

U.S.C. § 12202 (Count III); violation of her right to equal protection of the laws, actionable pursuant

to 42 U.S.C. § 1983 (Count IV); retaliation in violation of the First Amendment (Count V); retaliation

in violation of Title VII (Count VI); sexual harassment in violation of Title VII (Count VII); and

intentional infliction of emotional distress (Count VIII).[1] Defendants seek summary judgment on

Counts I, II, IV, V, VI, VII, and VIII (all claims other than the ADA claim). For the reasons set forth

---

[1]    This court dismissed Count IX, a claim of negligent infliction of emotional distress,
on December 4, 2002.

here, the motion is granted in part and denied in part.

## FACTS

The facts are set forth in Defendant's Local Rule 56.1 Statement of Facts, supported by a number of exhibits. Although Plaintiff has responded to this motion, she has not filed a statement that responds, paragraph by paragraph, to Defendant's 56.1 statement, as required by the court's Local Rule 56.1(b). Accordingly, the statements in Defendant's 56.1 statement may be deemed admitted. *See Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003), citing *Michas v. Health Cost Controls of Illinois, Inc.*, 209 F.3d 687, 689 (7th Cir. 2000). Because Plaintiff has submitted her own statement of facts, however, the court will consider those statements, too, to the extent they are supported by evidentiary material and not inconsistent with the statements deemed admitted.[2]

Plaintiff, now known as Mickki Fatima Muhammad, has been employed as an officer with the Cook County Sheriff's Police since April 1983. (Deposition of Mickki Fatima Muhammad, Exhibit 10 to Defendant's Rule 56.1 Statement [hereinafter, "Muhammad Dep."], at 8.) Beginning in 1994, upon her return from injury leave, she was assigned to the position of investigator in the Fugitive Warrants Unit, (*id.* at 9-10), a light-duty position that she held for six months before being transferred to "Markham patrol" for the months of May, June, and July 1995. (*Id.* at 23-25.) In July 1995, as part of an agreement to settle an earlier EEOC charge, Plaintiff was returned to the Fugitive Warrants position, a position she held until her retirement on March 31, 2003. (*Id.* at 25, 29-30, 32; Exit Interview Record, Exhibit 11 to Defendant's Rule 56.1 Statement.)

**Plaintiff's Charges**

The last few years of Plaintiff's tenure with the Sheriff's Police were marked by conflict. On

---

[2] In addition to her statement of facts, Plaintiff has submitted 57 exhibits in support of her response to Defendants' motion for summary judgment. Because she cites only a handful of these exhibits in support of her Rule 56.1 statement, the court is uncertain of the significance or relevance of much of this material. The court has nevertheless reviewed the documents and will refer to certain items where the court determines their pertinence.

2

April 4, 2001, Plaintiff filed a charge of discrimination with the EEOC, in which she alleged discrimination on the bases of race, sex, and disability, as well as retaliation. (EEOC Charge, Exhibit 12 to Defendant's Rule 56.1 Statement.) Plaintiff's charge alleged that her supervisors had harassed her in the following ways: (1) she was required to remove a banner she had posted in her office in honor of Black History month; (2) she was instructed to assist a non-black male police officer, despite the fact that she had not been provided assistance when she had performed the job that officer held; (3) she was denied parking privileges that had been afforded to a non-black male officer; (4) she was sent on an arrest assignment without appropriate assistance; (5) she was accused of abusing telephone privileges and working too slowly; (6) her desk was relocated; (7) she was directed to provide a written explanation for having driven her own vehicle to work; and (8) she was ordered to obtain a current medical evaluation. (Id.)

A few days after filing her charge, on April 9, 2001, Plaintiff sent a packet of documents, including memoranda she had written describing incidents of alleged harassment, to First Deputy Chief James E. Malinowski by certified mail. (Memoranda, Exhibits 13 A-D to Defendant's 56.1 Statement.) In her cover letter to this packet, Plaintiff explained that she has "come to believe very strongly that there is a 'denial objective' in place against her," that she was treated unfavorably as compared with her co-workers, and that she was the target of a conspiracy. (Undated letters to Malinowski from Muhammad, Exhibit 13A to Defendant's 56.1 Statement.) Among the documents Plaintiff included in this mailing was a memorandum (to which she referred as "a to/from") to Sergeant M. P. Callahan. (March 22, 2001 Memorandum to Sergeant M. P. Callahan from Police Officer M. Fatima Muhammad, Exhibit 13B to Def.'s 56.1 Statement.) The memo, reportedly prepared at the direction of Lieutenant Judge, explained that Plaintiff had driven her personal vehicle to work on March 21 because she needed to drive family members directly to an appointment after work. She reported, further, that Sergeant Prybell had violated rules on "a few Saturdays" by transporting his own family members in the squad car, and that other police officers

3

drove their vehicles to work "simply because they want to." Plaintiff's memo stated that Lieutenant Judge's request that Plaintiff prepare "a to/from" explaining her use of her personal vehicle on March 21 was an example of harassment. The memo cited the following additional examples of the alleged harassment: (1) on February 7, 2001, a co-worker had seen the letters "HRO" on a banner Plaintiff had displayed in observance of Black History month, and had joked that the letters stood for the words, "Honkey Retard Out"; (2) Plaintiff's work desk was moved to the lockup area, creating a "circus like atmosphere" while her co-workers watched to see her response to this move; (3) an incident Plaintiff referred to as the "Christ Hospital Debacle," described more fully below; (4) after another co-worker successfully "politicked" for Plaintiff's primary assignment to be transferred to him, Plaintiff was directed to help him with the assignment; (5) on March 19, 2001, after Sergeant Prybell became aware that there was a "write up against him" relating to the incident at Christ Hospital, he verbally reprimanded her, falsely accusing her of abuse of her telephone privileges; (6) also on March 19, 2001, Sergeant Prybell urged her to work faster; (7) after Plaintiff complained that the requirement that she remove her posters reflected unfair treatment, Lieutenant Judge created bad blood between Plaintiff and a co-worker by telling him that "[Plaintiff] wants your pictures to come down."

A second memorandum included within this packet, dated March 20, 2001, reported several incidents in which, according to Plaintiff, other Cook County officers reportedly violated the department's policies for use of their weapons. (March 20, 2001 Memorandum from Muhammad to Judge, Exhibit 13C to Defendant's 56.1 Statement.) Yet another memorandum, dated March 19, 2001 and directed to Lieutenant Judge, recounted Plaintiff's complaint concerning an incident on March 14, 2001, when she had been dispatched to Christ Hospital in Oak Lawn to arrest an individual being treated there. (March 19, 2001 Memorandum from Muhammad to Judge, Exhibit 13D to Defendant's 56.1 Statement.) Plaintiff reported in her memorandum that she learned that the individual in question had threatened to shoot a police officer. When she sought out Sergeant

4

Prybell for further instruction, he told her to "just cuff him [the arrestee] to the bed," and then turned and walked away. Plaintiff did not at that time ordinarily carry handcuffs and had to obtain a set in order to carry out the assignment. She later learned from other officers that in such circumstances the correct procedure required that the suspect not only be handcuffed, but also shackled. Plaintiff was, in her words, "unprepared, unprotected, and uninformed" to carry out the assignment. When she arrived at Christ Hospital, she learned that the suspect had been a patient there since March 5, had phone and visitor privileges, and was not restrained. Plaintiff herself was recovering from surgery at the time and still had stitches "in her affected part," and was therefore at some physical risk in taking the suspect into custody. She contacted Sergeant Prybell four times for directions. She also pointed out that she was required at that time to take medications with food and therefore needed "lunch relief." Plaintiff asserts that, for any male arrestee not confined in the Cook County Department of Corrections medical facility, the General Order requires that he be guarded by a male police officer.

When he received this packet of materials, Chief Malinowski forwarded them to Brian Flaherty, a legal assistant in the Sheriff's Department Division of Legal and Labor Affairs, who forwarded them, in turn, to the Office of the Inspector General on April 9, 2002. (Summary Report of Inspector General, Exhibit 14 to Defendant's 56.1 Statement, at [unnumbered] page 6.)[3]  On April 11, 2001, the OIG opened an investigation into Plaintiff's allegations that Sergeant Prybell and

_____

[3]      In her own Rule 56.1 Statement, Plaintiff asserts that she reported "the treatment she was receiving" to Chief Malinowski, but he "turned a blind eye to the conduct." (Plaintiff's 56.1 Statement ¶ 56.) In support of this statement, Plaintiff cites only her own memoranda, described above, and her affidavit, in which she asserts that she sent reports to Malinowski "at all times" and he "turned a blind eye to the conduct." (Affidavit of Mickki Fatima Muhammad, [hereinafter, "Muhammad Aff."], ¶ 23.) As noted, the court has considered Plaintiff's 56.1 Statement where it is supported by admissible evidence. Plaintiff has submitted no evidence of any reports to Chief Malinowksi other than those submitted as exhibits to Defendant's 56.1 Statement. As explained above, when he received those documents in a packet on or around April 9, 2001, Chief Malinowski promptly sent the materials to the Office of Inspector General for an investigation. There is, thus, no evidentiary support for Plaintiff's assertion that Malinowski ignored her complaints.

Lieutenant Judge had violated various rules and regulations and were creating a hostile work environment for Plaintiff. The investigators heard Plaintiff's own statements, given on April 23 and April 26, 2001 in the presence of her counsel, and interviewed Prybell, Judge, and 22 of Plaintiff's co-workers.

**Removal of Materials Posted on the Walls**

The February 7, 2001 incident was the first matter mentioned in Plaintiff's charge of discrimination and was a prominent matter in her complaint to Chief Malinowski, so the court addresses it first. Plaintiff had posted a number of items on the wall in her office, which she described as follows:

> I had a banner that I had purchased that to me when I bought the banner it looked like it had three black people on it. I also had a poster up of kings and queens of Africa. I had a poster up of a representation of the slave ship and how the slaves were packed into the ship during transport to the New World. I had a poster up of Michael Jordan. I had a poster up – not really a poster, but a page I had got out of a magazine of a room that I liked, just furniture and color scheme that I liked. And then I had some job-related material up, phone numbers to different courts that I dealt with on a daily basis and other memo – department memoranda I had up.

(Muhammad Dep., at 64.) Plaintiff has acknowledged that the banner – referred to by several witnesses as a "tapestry" – stretched from floor to ceiling. (Plaintiff's Statement to Inspector General [hereinafter, "Plaintiff's OIG Statement"], Exhibit 24 to Def.'s 56.1 Statement, at 5.) Plaintiff hung the tapestry or banner on her wall on February 7, 2001, in honor of Black History Month. Officer Donald Morrison and Officer Wayne Layer noted the letters "AS-HRO" on the banner; Plaintiff asserted in her affidavit that Morrison and Layer asked her what those letters stand for and then falsely reported to other officers in the unit that the letters "ASHRO" were offensive, racially charged epithets. (Muhammad Aff. ¶ 12 .)[4]

Cook County Sheriff's Police Department Rules provide that "[n]o material shall be affixed

---

[4]    The court understands that "AS-HRO" is nothing more than the name of the manufacturer of the banner. (*See* February 14, 2001 Letter from David Huenecke of Hancock Fabrics to Plaintiff, Exhibit 21 to Plaintiff's 56.1 Statement.)

in any way to any wall in Department buildings without specific authorization from a commanding officer." (Department Rules and Regulations, Exhibit 22 to Def.'s 56.1 Statement, ¶ 8.5.) On the same day that she hung the banner,[5] Sergeant Prybell approached Plaintiff and directed that she remove it and other items from the walls. (*Id.* at 4; Plaintiff's 56.1 Statement ¶ 14.) In an affidavit, Plaintiff asserts that Sergeant Prybell did not order any other officer to remove items from their offices (Muhammad Aff. ¶¶ 9, 19), but her own testimony is to the contrary. In her deposition, she testified that after she complained of being singled out, she learned that Sergeant Prybell had ordered another employee to remove a "Three Stooges poster." (Muhammad Dep., at 68.) The court notes, further, that in one of the "to/from" documents Plaintiff drafted, she complained that Lieutenant Judge had created bad blood between Plaintiff and a co-worker by telling him that "[Plaintiff] wants your pictures to come down." (March 22, 2001 Memorandum to Sergeant M. P. Callahan from Police Officer M. Fatima Muhammad, Exhibit 13B to Def.'s 56.1 Statement.) As part of its investigation of Plaintiff's charges, the Inspector General's office obtained written statements in the form of questionnaire answers from a number of Plaintiff's co-workers; Officer Myron Weres reported in his statement that "I had a 3 Stooges Poster - Told to Take it Down by Sgt. Prybell." (Weres Statement, Exhibit 23K to Def.'s 56.1 Statement.)[6] Another officer reported to the Inspector General's office that "We all had something on the walls – we were all told to take things down."

---

[5]    In her 56.1 Statement, Plaintiff asserts that the "tapestry, calendar and picture were up for eight months prior to February, 2001 without comment by command staff." (Plaintiff's 56.1 Statement ¶ 37.) On the deposition page she cites, however, Plaintiff testified that although some items had been posted for six months, she posted the banner and calendar "in 2001." (Muhammad Dep., at 66.) In her April 23, 2001 statement to investigators, Plaintiff began her description of the incident with the words, "This was February 7, 2001 and *I had this banner that I had just put up that day* and it depicted what looked like three black people on it to me. I bought it in a fabric store. . . ." (Plaintiff's April 23, 2001 statement, Exhibit 24 to Def.'s 56.1 Statement) (emphasis added).

[6]    Officer Weres' statement is hearsay, but the court includes it as corroborative of Plaintiff's own testimony concerning this matter.

(Statement of Officer Steve Erickson, Exhibit 23M to Def.'s 56.1 Statement.)[7] Plaintiff testified that

a group of photos posted on the third floor have never been removed, however. (Muhammad Dep.,

at 69.)[8]

**Plaintiff's Dispatch to Christ Hospital**

As noted in her complaints, described above, Plaintiff expressed grave concerns regarding

an incident that occurred on March 14, 2001, in which she was assigned to arrest and guard a

hospitalized man wanted on a warrant issued in Wisconsin. In his statement to the OIG

investigator, Sergeant Prybell explained his decision to assign this responsibility to Plaintiff as

follows:

> It was a emergency hospital take over. Oak Lawn had called us and informed us that there was a gun shot victim at Christ Hospital and that he had a child molester Warrant outstanding. I was told by Investigator Morrison, who does extraditions, that no one was guarding him at that time. Morrison told me that he talked to the nurse on the floor where the subject was and that the subject did not pose any threat and that he had a chest tube in him and was confined to the bed at that time. The jail will not send a guard until they have an officers name and they have to talk to that officer where the prisoner is confined. The only person that I had available was Officer Mohammed. I was the only supervisor at the building so I could not go. Officer Mohammed has refused to work the desk, so I could not send the desk officer, so she was the only one left, so since I needed to send someone right away or the wanted subject could walk out of the hospital. Being aware that females guard males at the jail and because of the emergency nature of the assignment, I made the decision to send her. Officer Morrison could not go because he was going to court that time. All other on duty officers were out on assignment.

(Prybell Statement, at 3.) Prybell stated, further, that Plaintiff did not tell him she was unable to

perform the assignment. (*Id.* at 3, 4.) Plaintiff did in fact carry out the assignment without any

problem. (Plaintiff OIG Statement, at 10.) She and Prybell both recalled that she contacted him

---

[7]     Although not admissible for its truth, Officer Erickson's statement is admitted only as evidence of what the investigators assigned to review Plaintiff's complaints learned.

[8]     The photographs she refers to may be those described by Cynthia Bell, a clerk, who was interviewed as part of the OIG investigation. Bell stated that the photos were "of members of the unit and unit functions," and that Plaintiff had told Bell she should remove the photos. (Bell Statement, Exhibit 23L to Def.'s 56.1 Statement.)

four times with questions concerning the expected arrival of an officer from the jail to relieve her, her need for a lunch break, and her need for assistance from the hospital staff for a personal break. (*Id.*; Prybell Statement, at 4.) The Office of Inspector General concluded that Sergeant Prybell's assignment of Plaintiff to guard a male prisoner was "a technical violation of General Order 80-1," but was excusable because this was "an emergency situation requiring immediate action" and no other officer was available to execute the arrest warrant. (OIG Report, Exhibit 14 to Def.'s 56.1, at (unnumbered) page 11-12.)

**Other Incidents of Alleged Unfair Treatment**

Plaintiff complains of a number of other incidents in which she believes she was singled out for unfair treatment or harassment. For example, Plaintiff believes Lieutenant Judge acted unfairly when he required Plaintiff to prepare a "to/from" explaining her decision to drive her own car, rather than her official vehicle, to work on March 21. In response to questions by the OIG investigators, Lt. Judge explained that Department cars were in short supply and that "other[s] could use the [Plaintiff's official] car" if Plaintiff chose not to use the one assigned to her. (Judge Statement, Exhibit 20 to Def.'s 56.1 Statement, at 4.) The OIG investigation concluded that Judge's request was reasonable; Department policy requires officers to be "properly uniformed and equipped," and Plaintiff's assigned police vehicle is part of her equipment. (OIG Report, Exhibit 14 to Def.'s 56.1 Statement, at 7, citing Cook County Sheriff's Police Department Rules and Regulations, Exhibit 19 to Def.'s 56.1 Statement, ¶ 12.12.) Although Plaintiff reported in her March 22 memorandum that other officers drove their vehicles to work "simply because they want to," she did not identify any such officers in her submissions to the court, nor did she offer evidence that these other officers were not required to provide a written explanation.

Similarly, Plaintiff complained that she was not provided with reserved parking in the lot adjacent to the Fugitive Warrant Unit Building, where she worked. Lieutenant Judge and Sergeant

Prybell both testified that there are only three reserved spots in the parking lot, one assigned to the commanding officer and two others assigned to sergeants. (Judge Statement, at 4; Prybell Statement, Exhibit 21 to Def.'s 56.1 Statement, at 3.) Plaintiff has offered no evidence to rebut this, nor has she identified any other officer at her level who enjoyed a reserved parking spot.

Plaintiff appears to believe that Department Rules were enforced inconsistently. She notes her observations of Sergeant Prybell and Officer Wayne Layer entering the lockup on March 1, 2001 while wearing their weapons, a violation of Department policy. Plaintiff reported the matter to Deputy Steve Erickson. (Plaintiff's OIG Statement, at 3-4.) Lt. Judge testified that when she brought this matter to his attention verbally on March 1, 2001, he immediately prepared and posted a memorandum reminding staff "to secure your weapon before entering lockup. **NO EXCEPTIONS!!**" (Judge Memorandum dated March 1, 2001, Exhibit 25 to Def.'s 56.1 Statement (emphasis original); Judge Statement, at 4.) It is undisputed that Plaintiff did not report the March 1 incident in writing until her memorandum of March 20, 2001.

Plaintiff complains about being moved from her job assignment as "extraditions officer" to the work of "lodging warrants." On March 9, 2000, Sergeant Epps reassigned the extradition assignment, which had been Plaintiff's, to a white male employee. (Muhammad Dep., at 39-41.) After the reassignment, Plaintiff complains, she was required on occasion to assist the white male officer working on extraditions. (Plaintiff's EEOC Charge; March 22, 2001 Memorandum, Exhibit 13B to Def.'s 56.1 Statement; Muhammad Dep., at 45.) Lieutenant Judge acknowledged that Plaintiff was directed to assist the officer with the work load; he explained, "[a]s far as helping a 'non-Black officer,' my officers help each other; color has nothing to do with it." (Judge Statement, at 3.)

Plaintiff complains, further, about an office reassignment in 2001. A prisoner had escaped from the Fugitive Warrant Unit facility on January 14, 2001. (Muhammad Aff. ¶ 7; Judge

Statement, at 2; Prybell Statement, at 2.) Plaintiff herself gave chase and successfully apprehended the prisoner. (Muhammad Aff. ¶ 8.) When Plaintiff arrived at the unit on the morning of February 26, Sergeant Prybell told her that she was being moved to a location near the lockup. Plaintiff recalls that Prybell explained, "we had an escape and the First Deputy Chief wants somebody in the lockup at all times." (Plaintiff's OIG Statement, at 2.) Lieutenant Judge, similarly, explained to OIG investigators that the Chief of Police wanted supervising sergeants on duty to occupy offices on the first floor of the facility rather than on the third floor. (Judge Statement, at 2.) Plaintiff, who was at that time assigned to the job of "lodging warrants," which she concedes she could perform in any location, was moved from her office to a desk near the lockup, 10 to 15 feet away from the office. (Muhammad Dep., at 86; Prybell Statement, at 2.) Plaintiff recalls that other officers on duty that day were "basically . . . just standing around looking." (Plaintiff's OIG Statement, at 2.) Prior to the move, Plaintiff had access to a phone in her office. (Muhammad Aff. ¶ 13.) She had no telephone on her desk in the lockup and, despite Sergeant Prybell's direction that she "couldn't have a phone there," Plaintiff brought her own phone from home and connected it to the phone jack. (Muhammad Dep., at 88.)[9] Defendants assert that while some officers in the unit have telephones on their desks, others, including white males, do not. (Def.'s 56.1 Statement ¶ 39.) Plaintiff herself has not suggested that all other officers had telephones on their desks.

Plaintiff was disciplined on a handful of occasions between 1995 and March 20, 2003, when she gave her deposition. (Muhammad Dep., at 33-34.) Plaintiff contends that the discipline was in retaliation for her complaints. (Muhammad Aff. ¶ 57.) The only such incidents that she

---

[9]        Plaintiff asserts that she was transferred to the lockup in order to isolate her from her co-employees and that she was "stripped of all phone privileges." (Plaintiff's 56.1 Statement ¶¶ 26, 27.) The deposition pages she cites do not support these statements, however. The evidence she cites for her assertion that she was transferred as a punishment consists only of rumors "in the air" at the facility. (Muhammad Dep., at 87.) In any event, Plaintiff's claim that she was "stripped of phone privileges" in February 2001 is inconsistent with her testimony that she used a telephone across the room to perform her job responsibilities (id. at 88), and with her assertion that Sergeant Prybell disciplined her unfairly for abuse of telephone privileges just a month later.

remembered specifically were occasions on which she was disciplined for taking days off as medical leave at times when, as she acknowledged, she had no medical leave available. (Muhammad Dep., at 36-37.) Plaintiff's exhibits include a number of disciplinary notices for taking unauthorized leave. (Exhibits 13-19, 27-29.) In addition, Plaintiff herself has furnished a copy of a general order of the Cook County Sheriff's Police Department, which provides: "If an employee is in a zero/no pay status because of no time available that individual shall not be authorized to take an additional day off. Individuals failing to report for duty will be considered to be absent without permission and as such shall be subject to disciplinary action." (Chief Burke Order, Exhibit 5 to Plaintiff's 56.1.) She offers no evidence that other officers who were absent without accrued leave were not accorded such discipline, nor any other evidence that the issuance of these disciplinary notices was a product of discrimination.

No other formal discipline was imposed on Plaintiff. On March 19, 2001, however, Plaintiff was assigned 17 warrants to "lodge" between 7:00 a.m. and 10:00 a.m. She completed only three of these assignments and the work was reassigned to two white male officers. (Def.'s 56.1 ¶ 53.) Sergeant Prybell spoke to Plaintiff about this matter, pointing out that he had observed her in telephone conversations three times that morning. (Id. ¶ 52.) Plaintiff responded by accusing Sergeant Prybell of disliking her ever since the time that she had worked with him at the State's Attorneys' Office, years before. (Id.) At her deposition, however, Plaintiff testified that she does not believe there was any animosity between herself and Sergeant Prybell, but she believes he is "strange" and "weird," as demonstrated by the fact that he calls her "Brenda," the name she had at the time he first met her. (Muhammad Dep., at 83.)

Plaintiff testified that she was denied permission to seek "secondary employment" on two occasions. (Id. at 52-53.) In her Rule 56.1 Statement, Plaintiff did not identify the individual(s) to whom her requests were made, or when she made them. She did include copies of two "Secondary Employment Request" forms in her exhibits, however. It appears that she submitted

one such request on July 20, 2000, and that Sergeant Prybell, Lieutenant Judge, and Chief Malinowski disapproved the request. (July 20, 2000 Request, Exhibit 20 to Plaintiff's 56.1; a second copy appears within Exhibit 26 to Plaintiff's 56.1.)[10] The court is unable to discern whether any action was taken on a second request, dated June 25, 2001. (June 25, 2001 Request, within Exhibit 26 to Plaintiff's 56.1.) Plaintiff has offered no evidence that male officers in similar circumstances were granted leave to engage in secondary employment by the same decision-maker(s). She also complains that she was denied pay "during the times of years that I would have been able to take the sergeant's exam," but she acknowledges that she never "put in for a supervisory position." (Id. at 53.)

### Other Materials Submitted by Plaintiff

As noted, Plaintiff has submitted a number of exhibits to which she makes no reference in her 56.1 Statement. These documents reflect disputes between Plaintiff and her co-workers and supervising officers concerning a variety of matters. For example, in May 2001, Officer Wayne Layer made a written complaint that on two occasions, Plaintiff had "harassed" him by touching his side as he entered the lockup to ascertain whether he was carrying a weapon in violation of Department policy. (Memorandum of May 30, 2001, Exhibit 45 to Plaintiff's 56.1.) In November 2001, Plaintiff was assigned to drive a 1997 Ford Crown Victoria as her official vehicle; Plaintiff found the vehicle dirty and refused to accept it. (Memorandum of December 19, 2001, Exhibit 36 to Plaintiff's 56.1; Memoranda of August 24, 2001, September 19, 2001 and June 4, 2002, Exhibit 46 to Plaintiff's 56.1.) Plaintiff believed she had been made ill by the cold temperatures in the station house in December 2001 and that her medical leave bank was improperly docked when she

---

[10] A typed but unsigned and undated document accompanying this exhibit recounts that Sergeant John Glaubke advised Plaintiff her July 2000 request was denied because she "can't work the desk," "can't ride all day in a squad car," "can't do apprehensions," and was "on light duty." As noted, Plaintiff has not identified or explained the relevance of these exhibits in her 56.1 Statement. The court surmises this document is relevant, if at all, to Plaintiff's disability discrimination claim, which is not the subject of this motion.

was forced to take a sick day due to these conditions. (Memoranda of December 6, 2001, Exhibits 34, 35 to Plaintiff's 56.1.) In March 2002, Plaintiff wrote memoranda about an episode in which her personnel file was missing from the file, and later reappeared, circumstances she found suspicious. (Memorandum of March 19, 2002, Exhibit 40 to Plaintiff's 56.1.)

## DISCUSSION

In this motion, Defendants seek summary judgment on Plaintiff's claims of race discrimination (Counts I and II); an equal protection violation (Count IV); retaliation (Counts V and VI); sexual harassment (Count VII); and intentional infliction of emotional distress (Count VIII). In her response to this motion, Plaintiff concedes that Defendants are entitled to summary judgment on her retaliation claims (Counts V and VI) and on her claim of intentional infliction of emotional distress (Count VIII). (Plaintiff's Response to Defendants' Motion for Summary Judgment [hereinafter, "Plaintiff's Response"], at 13.) In this decision, the court considers whether Defendants are entitled to summary judgment on Plaintiff's claims of race discrimination, equal protection, and sexual harassment.

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In determining whether there is a genuine issue of fact, the court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001). The court's function in ruling on a motion for summary judgment is not to weigh the evidence, but rather to determine if there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Where factual matters are in dispute, the court is required to credit the nonmovant's version of events. *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 802 (7th Cir. 2000).

This court's Local Rules explain in detail the procedure required for preparing and for responding to a motion for summary judgment. Under Rule 56.1(b), the party opposing summary judgment is expected to file "a response to each numbered paragraph in the moving party's statement [of facts], including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials" on which she relies. Local Rule 56.1(b)(3)(B) makes clear that if the non-moving party fails to controvert the moving party's statement of facts in this method, the moving party's statement "will be deemed to be admitted." The Seventh Circuit has repeatedly upheld strict enforcement of these rules. *See Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921-22 (7th Cir. 1994) (collecting cases).

Although Plaintiff has complied with Rule 56.1 in part, by submitting her own statement of facts that she believes requires denial of the motion, her failure to respond "to each numbered paragraph" in Defendants' statement means that those paragraphs may be deemed admitted. As noted, however, the court has considered not only her statement of additional facts, but also those exhibits she has submitted, whether or not referenced in her 56.1 Statement, where the court could determine their relevance. In determining whether Defendants' motion for summary judgment should be granted, the court addresses Plaintiff's claims in turn.

## I.    Race Discrimination (Counts I and II)

In Counts I and II of Plaintiff's Amended Complaint, she alleges that Defendants discriminated against her on the basis of her race in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e (Count I); and under 42 U.S.C. § 1981 (Count II). Both Title VII and § 1981 prohibit employers from discriminating against an employee in the terms, conditions, or privileges of employment based on the employee's race. 42 U.S.C. § 2000e et seq.; 42 U.S.C. § 1981. "While 1981 and Title VII differ in the types of discrimination they proscribe, the methods of proof and elements of the case are essentially the same." *Van Zuckerstein v. Argonne Nat'l Laboratory*, 984

F.2d 1467, 1472 (7th Cir. 1993). The court therefore will analyze Counts I and II simultaneously. *See Eiland v. Trinity Hosp.*, 150 F.3d 747, 750 (7th Cir. 1998) (claims under § 1981 and Title VII are analyzed in the same manner).

A plaintiff may prove intentional employment discrimination under Title VII by using either the "direct method" or "indirect method." *Rhodes v. Illinois Dep't. of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004), citing *Cianci v. Pettibone Corp.*, 152 F.3d 723, 727-28 (7th Cir. 1998). Under the direct method, plaintiff offers direct or circumstantial evidence that adverse action was motivated by her race. Direct evidence is rare, as it "essentially requires an admission by the decision-maker" that he took actions for unlawful reasons. *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003). The direct method of proof can also entail presentation of a "convincing mosaic" of circumstantial evidence that "allows a jury to infer intentional discrimination," *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir.1994), where that circumstantial evidence "point[s] directly to a discriminatory reason for the employer's action." *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003). Under the alternative method of proof, the indirect method, plaintiff presents a prima facie case of discrimination by offering evidence that she was a member of a protected class, that she performed her job satisfactorily, that she suffered an adverse action, and that similarly situated individuals outside the protected group were treated more favorably. If she makes such a showing, her employer must offer evidence that there was a legitimate non-discriminatory reason for its action; plaintiff will survive summary judgment if a jury could find that the reason articulated by her employer was a pretext. *Cianci*, 152 F.3d at 725.

Under either method of proof, in order to prove that she was the victim of unlawful discrimination, Plaintiff must show that she suffered one or more "materially adverse employment actions" on the basis of her race. *See, e.g., Haugerud v. Amery School Dist.*, 259 F.3d 678, 691 (7th Cir. 2001). Our Court of Appeals has defined such an action as something "more disruptive

than a mere inconvenience or an alteration of job responsibilities," *Crady v. Liberty Nat. Bank and Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993); rather, it is "a significant change in the claimant's employment status such as hiring, discharge, denial of promotion, reassignment to a position with significantly different job responsibilities, or an action that causes a substantial change in benefits." *Rhodes*, 359 F.3d at 504 (citing *Bell v. E.P.A.*, 232 F.3d 546, 555 (7th Cir. 2000)). "Not everything that makes an employee unhappy qualifies as adverse employment action." *Id.* (citation omitted).

Defendants argue here that Plaintiff has not suffered an adverse employment action as the Seventh Circuit has defined it. As described above, Plaintiff has presented evidence concerning a number of circumstances and incidents that she believes are improper or unfair. In her brief in opposition to summary judgment, she focuses on three actions she deems materially adverse, characterizing them as violations of Title VII: unfair discipline; denial of secondary employment; and being moved to an unfavorable workspace. (Plaintiff's Response, at 6.) In addition, she contends that Sergeant Prybell's direction that she remove items from the walls of her office constituted race discrimination in violation of § 1981. (Plaintiff's Response, at 9.)

The episode involving materials posted on the walls requires little discussion. The court doubts that an order requiring a worker to remove materials from the walls can constitute a tangible adverse action. Assuming that it does, the court notes that (a) police department rules prohibit the posting of materials without authorization, and (b) there is ample evidence that Sergeant Prybell required other employees, as well, to remove materials from the walls at the station. Plaintiff testified that Sergeant Prybell told her that, pursuant to Chief Malinowski's order, her "stuff" had to be removed because "this was a police department and only police-related materials could be on the walls." (Muhammad Dep., at 67.) The records suggest that little attention was paid to this matter until February 7, 2001, when Plaintiff brought her large banner to the police station, but it does not surprise the court that the posting of a floor-to-ceiling banner (one witness described it

as 7 feet by 7 feet) would be the first item to draw the supervisor's attention and spur him to enforce the rules. The fact that co-workers made ignorant remarks about letters that appear on the banner does not convert Sergeant Prybell's order to an incident of race discrimination.

With respect to the claim of unfair discipline, the court concludes, for purposes of this motion, that Plaintiff has met her burden of establishing a tangible adverse action. Plaintiff notes that she was disciplined on three occasion and she lost pay on two days, July 19 and August 3, 2000. *See Russell v. Board of Trustees of Univ. of Illinois.*, 243 F.3d 336, 341 (7th Cir. 2001) (a five-day suspension, resulting in a permanent record of disciplinary action, constitutes an adverse job action); *Silk v. City of Chicago*, 194 F.3d 788, 800 (7th Cir. 1999) (suspension resulting in three days' lost pay is more than a "minor or trivial action"); *but see Rhodes*, 359 F.3d at 504-05 (one-day disciplinary suspension without pay not actionable where it had only a negligible impact on her income and caused no material harm). Plaintiff's own evidence establishes, however, that her employer had a legitimate, non-discriminatory reason for imposing discipline: Plaintiff had used all her available medical leave time and was thus disciplined for failing to report to work. (Muhammad Dep., Exhibit 10 to Def.'s 56.1, at 36-37.) Plaintiff acknowledged that she did not have leave time available, and for that reason did not file a grievance to contest the discipline. (*Id.*) The wisdom of Defendants' medical leave policy is not at issue here. *Driebel v. City of Milwaukee*, 298 F.3d 622, 637 (7th Cir. 2001) (with respect to a police department's treatment of its officers, federal courts do not "act as super-personnel boards"). Where there is no showing that white officers were granted leave more generously than Plaintiff, this discipline does not support her claim of race discrimination.[11]

---

[11]     The record includes evidence of other incidents which Plaintiff believes demonstrate unfair treatment, including Lieutenant Judge's demand for a "to/from" regarding Plaintiff's use of her private vehicle; requests that Plaintiff provide medical evaluations (the court is uncertain whether these requests related to Plaintiff's absences from work or to some accommodations she
(continued...)

Her claim that she was denied the right to seek secondary employment on the basis of race fails for a similar reason. Defendants argue that Plaintiff's own evidence shows the reason that her requests were denied: Department General Orders require such requests to include the name of the prospective secondary employer and an indemnity agreement signed by that potential employer. (Cook County Sheriff's Police Department General Order 00-11-A, Exhibit 22 to Pltf.'s 56.1, at 3 ¶ 4.) One of Plaintiff's requests did not include an indemnity agreement, and the other included neither the indemnity agreement nor the name of the prospective employer.[12] Most importantly, Plaintiff has offered no evidence of any similarly situated white officer who was permitted to pursue secondary employment. It may well be that Defendants granted white officers' requests for secondary employment even when those officers failed to provide signed indemnity agreements; but Plaintiff has offered no evidence of such an occurrence, and the court believes such evidence should be readily available in discovery, if it exists.

Finally, the court considers Plaintiff's objection to the movement of her work space from what the court understands was a private office to a desk near the lockup. Under some circumstances, a significant change in working conditions can constitute adverse action. In *Collins v. State of Illinois*, 830 F.2d 692, 703 (7th Cir. 1987), plaintiff, a consultant to the state library system, was moved from her office to a receptionist's desk outside her supervisor's office and lost her phone, her business cards, and her listings in professional directories. These events

_____

[11](...continued)
may have requested); and Plaintiff's observations that other officers violated the Department's policy for use of weapons. Plaintiff has not formally argued that any of these matters constitutes tangible adverse action for purposes of her claims of race discrimination or sex discrimination, and as noted above, she has withdrawn her retaliation claims. Accordingly, the court does not include those incidents in its analysis.

[12]      To the extent Plaintiff has suggested that Defendants relied on her "light duty" status as the real reason her requests were denied, the court presumes that evidence relates to her ADA claim, which is not at issue in this motion.

were, in the court's view, adverse employment action sufficient to support the jury's verdict on her race discrimination claim. Similarly, in *Thomas v. Habitat Co.*, 213 F. Supp. 2d 887, 896 (N.D. Ill. 2002), the court concluded that although some of the circumstances plaintiff complained about were insignificant, her evidence was sufficient in the aggregate to survive summary judgment on her retaliation claim: her working hours were changed; she was required to obtain keys to enter work space; she was excluded from office areas when coworkers were present, denied assistance, and required to "punch in" in a dirty closet with bad wiring that caused injury; and she received a series of undeserved disciplinary notices. *See also Knox v. State of Indiana*, 93 F.3d 1327, 1334 (7th Cir. 1996) (moving an employee "from a spacious, brightly lit office to a dingy closet" could constitute an adverse employment action).

Where a plaintiff's move to a different workspace is not accompanied by other negative events, however, courts often find such a move insufficient to trigger scrutiny. Thus, in *Kersting v. Wal-Mart Stores, Inc.*, 250 F.3d 1109, 1119 n. 2 (7th Cir. 2001), plaintiff was assigned to work in a fenced-in area within the building, known as "the cage," which in plaintiff's view was a kind of punishment. The Seventh Circuit affirmed the conclusion that this assignment was not adverse employment action for purposes of a retaliation claim, where there was no testimony from colleagues to support his allegation, and no evidence that work in the cage involved lower pay, different hours, or any sort of hindrance from earning pay. *See also Nielsen v. Acorn Corrugated Box Co.*, No. 01 C 1988, 2002 WL 1941365, *6 (N.D. Ill. Aug. 21, 2002) (move to a broken-down, smaller and less stable desk in a less "aesthetically pleasing and cramped work area" not actionable where the changed desk caused no material loss, and plaintiff's job responsibilities, title and pay remained the same); *Daniel v. Skudder Kemper Investments, Inc.*, No. 00 C 5961, 2002 WL 1160934, at *6 (N.D. Ill. May 23, 2002) (seat reassignment from window to location closer to supervisor does not constitute an adverse employment action).

Plaintiff argues that she "was relocated from her office to an open male lockup area with no phone and only a desk, her name was removed from the roster board and [she] was shipped to a corner of the office when nobody would see her or interact with her." (Plaintiff's Response, at 6.) The court is uncertain what Plaintiff means by the reference to the removal of her name from the roster board; there is no mention of this matter in her Rule 56.1 statement, nor did the court find such evidence in the 57 exhibits she submitted. Further, although Plaintiff apparently *believed* that her supervisors ordered the transfer "in order to isolate her from her co-employees," (Plaintiff's 56.1 Statement ¶ 27), there is no evidence that the transfer actually had that effect. In fact, it was the office she occupied prior to the move that, according to Plaintiff, was "not visible to the public or other employees." (*Id.* ¶ 36.)

Again, the evidence submitted by Plaintiff herself establishes the reason for Defendants' decision to move her from her private office to a desk near the lockup: Plaintiff testified that following an escape attempt that she herself thwarted, the First Deputy Chief made a decision to have "somebody in the lockup at all times" to prevent escapes. (Plaintiff's OIG Statement, at 2; Muhammad Aff. ¶ 14.) Lieutenant Judge explained that the Chief of Police wanted supervising sergeants on duty on the first floor, with the result that a supervisor was moved into the office Plaintiff had occupied. Although she contended that Sergeant Prybell rarely used the first-floor office (*Id.* ¶ 15), Plaintiff has not otherwise rebutted this legitimate reason for the move, and she acknowledges that she could perform her responsibilities for lodging warrants from the desk to which she was moved. (Muhammad Dep., at 86.)

The desk to which Muhammad was moved lacked a phone, and Defendants have not rebutted her assertion that Sergeant Prybell told her she "couldn't have a phone there." (Muhammad Dep., at 88.) Nor have they challenged Plaintiff's contention that being required to walk twelve feet from her desk to an available phone to perform her duties was inconvenient and

cumbersome. (*Id.*) In fact, however, Plaintiff apparently solved this problem by bringing her own telephone from home and plugging it in to the "active phone jack right by the desk they put [her] at." (*Id.*) Indeed, one month after the move, Plaintiff was warned (unfairly in her view) about excessive personal phone calls. Defendants assert that not all officers had phones on their desks, and Plaintiff has not rebutted that testimony. Most significantly, she has offered no evidence that white officers in circumstances similar to hers were not required to share phones with others. In short, Defendants' failure to furnish Plaintiff with a telephone for official use is regrettable, but there is no indication that it was a product of race discrimination.

The court therefore grants summary judgment in favor of Defendants on Counts I and II.

## II.    Equal Protection (Count IV)

Count IV of the Amended Complaint charges Defendants with violating Plaintiff's right to equal protection under the law and specifically identifies the nature of this violation as "Sex Harassment and Racial and Gender Discrimination." The court has addressed Plaintiff's race discrimination claim in the previous section and will focus on hostile environment/sexual harassment in its discussion of Count VII, below. Accordingly, the court's discussion of Count IV will be limited to sex discrimination claims.

To prove such a claim, as described above, Plaintiff may proceed either by way of the direct method, offering direct or circumstantial evidence of unlawful motivation, or by way of the indirect, or burden-shifting method. Again, as described above, under either method of proof, Plaintiff must first show that she suffered one or more "materially adverse employment" actions for an unlawful reason, i.e., because she is a woman. For the reasons discussed above, the court has concluded that the requirement that Plaintiff remove materials from the walls of her office does not constitute an adverse employment action. In any event, Plaintiff has not offered evidence from which the court could conclude that white officers or males were not subject to enforcement of the rule at

issue. Nor has she presented any evidence that white officers or males were not subject to the medical leave requirements under which she was disciplined by loss of one day's pay. There is no admissible evidence of any officer being authorized to engage in secondary employment under circumstances similar to Plaintiff's. Plaintiff was apparently the only officer whose workspace was moved to the lockup, but she has identified a non-discriminatory reason for this decision, and has not rebutted Defendants' assertions that other officers, including white males, did not have their own phones. Thus, as she has not established that these matters reflected race discrimination, the court concludes they also do not support her claim of sex discrimination.

Plaintiff has presented evidence concerning a handful of other matters, but the court concludes that they also are insufficient to meet her burden of proving that she was subjected to disparate treatment on the basis of sex. She notes, for example, that she performed the "extraditions" assignment until March 9, 2000 without assistance. In March 2000, the extraditions job was assigned to a white male officer, but Plaintiff was "then . . . pressed back into service to help him do the job that I never had help doing the part of the job that I did when I did the job." (Muhammad Dep., at 45.) The court does not believe that being required to assist a co-worker can be characterized as adverse action, and Plaintiff has not suggested that doing so was difficult or burdensome for her. Nor has she suggested that when she herself was responsible for extradition, she ever needed assistance or that her own request for assistance was denied. Plaintiff claims she was denied parking privileges, but has not rebutted Defendants' explanation that such privileges were available only to the commanding officer and to two sergeants. There is no evidence that any other officer at Plaintiff's level, male or female, enjoyed reserved parking at the Fugitive Warrants Building.

The remaining event that Plaintiff has presented as an instance of sex discrimination is the event she refers to as the "Christ Hospital Debacle." Viewed in the light most favorable to Plaintiff,

the evidence establishes only that Sergeant Prybell acted in violation of General Orders when he ordered Plaintiff, a female officer, to guard a hospitalized male with a history of violence who was wanted on an outstanding warrant. The assignment was unquestionably distressing to Plaintiff. She made four phone calls to Sergeant Prybell during the course of the assignment and prepared lengthy written memoranda outlining her complaints. It is undisputed, however, that she carried out the assignment effectively and without incident. She has offered no response to Sergeant Prybell's assertion, and the OIG's conclusion, that Prybell was responding to an emergency and there were no other officers available to him. In any event, being required to carry out the work of a police officer can not be viewed as an adverse employment action. *See Rhodes*, 359 F.3d at 504 (being directed to perform assignments or tasks consistent with standard job duties does not constitute adverse action). Most importantly, Plaintiff offers nothing that establishes that Prybell imposed this difficult assignment on her because she is a woman. To the contrary, the evidence reveals he did so in spite of her sex.

Defendants are entitled to summary judgment on Count IV.

## III.   Sexual Harassment (Count VII)

In Count VII of the Amended Complaint, Plaintiff alleges that Defendants engaged in a practice of sexual harassment by creating a hostile and abusive work environment. To establish a prima facie case under this theory, a plaintiff must demonstrate that: (1) she was subjected to unwelcome harassment; (2) the harassment was based on sex; (3) the sexual harassment had the effect of unreasonably interfering with the plaintiff's work performance in creating an intimidating, hostile or offensive working environment that seriously affected the psychological well-being of the plaintiff; and (4) there is a basis for employer liability. *Robinson v. Sappington*, 351 F.3d 317, 328-29 (7th Cir. 2003). A hostile environment is one that is "permeated with discriminatory intimidation, ridicule and insult." *Shanoff v. Illinois Dep't of Human Servs.*, 258 F.3d 696, 704 (7th

Cir. 2001). Proof of a hostile work environment requires evidence that the plaintiff was subjected to conduct "so severe or pervasive as to alter the conditions of employment and create an abusive working environment." *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 462-63 (7th Cir. 2002). To qualify as "hostile," the work environment must be "both objectively and subjectively offensive . . . ." *Id.* at 463.

Plaintiff here argues that she "was subjected to derogatory comments and discriminatory treatment by her supervising sergeant [Prybell] and lieutenant [Judge]," and that the "sexist and derogatory statements were made on a regular, daily basis." (Plaintiff's Response, at 7.) Defendant argues that it is entitled to summary judgment on this claim because Plaintiff has not offered admissible evidence of specific instances of harassment and because "[s]poradic use of abusive language, jokes, and occasional teasing are fairly commonplace in some employment settings" and are therefore not actionable. (Reply Memorandum in Support of Defendants' Motion for Summary Judgment, at 11.)

Although Plaintiff has offered few specifics regarding the dates and times of the alleged harassment, the court concludes what she has presented is sufficient to withstand summary judgment. In her interrogatory answers, Plaintiff asserted that Sergeant Prybell and Lieutenant Judge "repeatedly referr[ed] to me as 'the fucking bitch', 'the enemy,' and similar nom du plume [sic]." (Answer to Interrogatory No. 4, Exhibit 56A to Plaintiff's 56.1.) In response to a question regarding discipline imposed on her, Plaintiff asserted that it "included . . . referring to me as a 'fucking bitch' and 'piece of shit.'" (Answer to Interrogatory No. 10, Exhibit 56A to Plaintiff's 56.1.)[13] Although Plaintiff could not provide specific dates, she herself heard Sergeant Prybell refer to

---

[13]    In her 56.1 Statement and in her Response brief, Plaintiff asserts that Prybell and Judge also used racially-charged names, including "niggers," "shines," and "coons." The deposition pages she cites, however, make it clear that Plaintiff has no non-hearsay evidence that Prybell and Judge used racial epithets. (Muhammad Dep., 77-78.) Defendants' objections to these statements are therefore sustained.

women as "sluts" on "innumerable" occasions. (Muhammad Dep., at 137.) According to Plaintiff, "It was just the way that he referred to women daily." (*Id.*) Plaintiff testified that "that was the way they [Prybell and Judge] talked all the time, so I have heard those phrases from both of them referring to different women as that bitch or that fucking bitch, . . . ." (Muhammad Dep., at 78.)

"An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Parkins v. Civil Constructors of Illinois, Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998), citing *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998). If Plaintiff can prove that her supervisors created a hostile environment, her employer may be subject to strict liability. Defendants here note that Plaintiff has not demonstrated that she suffered a tangible employment action as a result of the alleged harassment, but where the alleged harasser is a supervisor, the absence of a tangible employment action is merely a possible affirmative defense, not a burden that Plaintiff must address in order to survive summary judgment.

Plaintiff has demonstrated that she was not alone in finding the atmosphere in the Fugitive Warrants Unit offensive. A female co-worker, Tanda Adams, complained that Lieutenant Judge created a hostile environment through his language and behavior, including "course, profane, and insolent language." (Feb. 19, 2002 Memorandum of Tanda Adams, Exhibit 11 to Plaintiff's 56.1.) Plaintiff wrote a memorandum in support of Ms. Adams' complaints, in which she referred to Sergeant Prybell's "constant usage of profane and vile language." (May 26, 2000 Memorandum, Exhibit 10 to Plaintiff's 56.1.) In interviews with the OIG, a number of other women confirmed Ms. Adams' complaints, as well. (Record of OIG Investigation, Exhibit 44 to Plaintiff's 56.1.) The court believes this evidence is sufficient, for purposes of summary judgment, to establish that the work environment was objectively offensive.

Plaintiff testified that she suffered from symptoms of stress from February 2001 until the time of Sergeant Prybell's transfer in 2002, including crying spells, bowel problems, and breaking out into hives. (Muhammad Dep., at 120, 126.) Plaintiff never sought professional counseling for these problems, but she testified that she sought support from individuals Plaintiff referred to as her "core group," consisting of her mother, her significant other, and her two best friends. (*Id.* at 120.) The court believes this evidence is sufficient, for purposes of summary judgment, to establish that the work environment was subjectively offensive as well.

Defendants' motion for summary judgment on Count VII is denied.

## CONCLUSION

The court finds no disputes of material fact concerning Plaintiff's claims of race or sex discrimination and concludes that Defendants are entitled to judgment in their favor on those claims as a matter of law. Counts I, II, and IV are therefore dismissed with prejudice. Plaintiff having voluntarily withdrawn her claims of retaliation and intentional infliction of emotional distress, Counts V, VI, and VIII are also dismissed. Disputes of fact preclude summary judgment on Plaintiff's hostile environment claim, however, and Defendant's motion for summary judgment on Count VII is therefore denied. Plaintiff's claim of disability discrimination under the Americans with Disabilities Act was not addressed in this motion, and Count III will therefore also proceed. As Counts III and VII state statutory claims for which there is no individual supervisory liability, Defendants Prybell, Judge and Malinowski are dismissed from this case as Defendants.

ENTER:

Dated: March 26, 2004

REBECCA R. PALLMEYER
United States District Judge